1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    CHIJIOKE ISAMADE,                          No.  2:22-cv-0358 AC P

12                    Plaintiff,

13         v.                                     ORDER & FINDINGS &
                                                  RECOMMENDATIONS
14    PARKER-WRIGHT, et al.,

15                    Defendants.

16

17         Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42

18   U.S.C. § 1983.  Currently before the court are defendants' motions to strike and for summary

19   judgment.  ECF Nos. 22, 41.  For the reasons discussed below, defendants' motion to strike is

20   granted in part and denied in part, and the undersigned recommends that defendants' motion for

21   summary judgment be granted on all claims.

22         I.      Procedural History

23         This case proceeds on plaintiff's complaint, ECF No. 1, which was found to state claims

24   for medical deliberate indifference against defendants Parker-Wright and Friedrichs[1], excessive

25   force against defendants Parker-Wright, Friedrichs, and Solovyev, and discrimination and

26   retaliation against defendant Solovyev.  ECF No. 7.  After the close of fact discovery, defendants

27   _____

28   [1]  Defendant Friedrichs was erroneously sued as Freiedrichs.  ECF No. 1 (Verified Complaint);
     ECF No. 16 (Answer).  The Court of the Clerk will be directed to update the docket accordingly.

                                                   1

1   filed a motion for summary judgment.  ECF No. 22.  Plaintiff filed an initial opposition and asked

2   for an extension to file a complete opposition.  ECF No. 23; ECF No. 23-2 at 2.  The first two

3   extensions were granted, but the third was denied.  ECF Nos. 25, 29, 32.  On January 13, 2025,

4   the court received plaintiff's supplemental opposition.  ECF No. 37.  Defendants were directed to

5   file a reply, which they did, along with a motion to strike.  ECF Nos. 38, 40-41.

6        Because the filings indicated that plaintiff had not had a chance to view the video

7   evidence, the court ordered defendants to make arrangements for plaintiff to view the video

8   evidence, and plaintiff was given leave to file a sur-reply, limited to addressing the contents of the

9   video.  ECF No. 42 at 2-3.  Arrangements were made, but plaintiff refused to view the video

10  evidence.  ECF Nos. 45-47.  Plaintiff filed a request to view the video evidence, a sur-reply to the

11  motion for summary judgment, and a motion for sanctions and dismissal.  ECF Nos. 43, 47-48.[2]

12  The court denied plaintiff's request and motion and disregarded his unauthorized sur-reply.  ECF

13  No. 49.

14       II.    Plaintiff's Allegations

15       The complaint alleges that plaintiff's rights under the First and Fourteenth Amendment

16  were violated on December 2 and 3, 2021, by the following actions: defendant Parker-Wright

17  abruptly ended his phone access, triggering an anxiety attack, ignored plaintiff when he pushed

18  the medical button twenty-one times to get medical assistance, and initiated an unnecessary use of

19  force response by calling custody staff to physically subdue plaintiff rather than contacting

20  medical after, ECF No. 1 at 3; defendant Friedrichs snatched plaintiff's legal paper out of his

21  hand, ripped the paper, tossed it away and plaintiff "was tackled to the ground" and "kneed by

22  officers on [his] throat over ten times which lead to internal bleeding in [his] oesophagus [sic],"

23  id. at 4; defendant Solovyev ordered deputies to batter him and to leave him while he choked on

24  his own blood for an hour and a half before finally allowing a nurse to check him and making an

25  emergency call to take plaintiff to the hospital, id. at 4-5; defendant Solovyev, who is of Russian

26

27  _____

    [2]  Plaintiff informed the court that he wanted to file an amended complaint after ruling on
28  summary judgment.  ECF No. 43.  On May 1, the court granted him thirty days to file a motion to
    amend, ECF No. 45 at 2, but he never did.

decent, made racist and condescending remarks towards plaintiff because of his African descent

and instructed deputies to batter plaintiff and ignore his medical needs, id.; and defendant

Solovyev retaliated against plaintiff by contacting the Sacramento district attorney to file felony

charges against plaintiff.  Id. at 5.  Plaintiff alleges defendants caused him emotional distress,

positional asphyxiation, and internal bleeding in his esophagus.  Id. at 3-5.

III.    Motion to Strike

A.    Overview

Defendants object to and seek to strike plaintiff's Exhibits F (Order for Release of Person

In Custody and Criminal Docket Sheet), ECF No. 37 at 52-56; I (United States Probation &

Pretrial Services Letter), id. at 67-68; J (DME Supply Receipt), id. at 69-71; K (History of Prior

Complaints), id. at 72-75; L (Medication Lists, from December 2024), id. at 76-78; and Q

(Charge Summary, Offense Date December 5, 2021), id. at 91-94.  ECF No. 41 at 5.  They object

based on lack of foundation and authentication.  Id.  They seek to strike based on plaintiff's

failure to disclose these records in response to defendants' requests for production ("RFP") Nos.

6-8, 10, 12, 18, 21, and 22.  Id. at 1-5; ECF No. 41-1 at 6-7 (Defendant Parker-Wright's RFP, Set

One, p.3-4).  Plaintiff did not file an opposition or otherwise respond.

B.    Objections

In reviewing evidentiary objections at summary judgment, courts "focus on the

admissibility of its contents" and not "on the admissibility of the evidence's form."  Fraser v.

Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).  Even if the non-moving party's evidence is

presented in a form that is currently inadmissible, such evidence may be evaluated on a motion

for summary judgment so long as the moving party's objections could be cured at trial.  Burch v.

Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119-20 (E.D. Cal. 2006).  Because it

appears plaintiff may be able to cure the deficiencies at trial, and courts in this circuit routinely

overrule objections based on lack of foundation and lack of proper authentication, defendants'

objections are overruled.  See e.g., See Chavez v. Ford Motor Credit Company, LLC, No. 1:23-

cv-1205 SKO, 2025 WL 1001587 at *1, 2025 U.S. Dist. LEXIS 64222 at *2-3 (E.D. Cal. Apr. 3,

2025); Morton v. Cnty. of San Diego, No. 21-cv-1428 MMA DDL, 2024 WL 5126281 at *4,

1    2024 U.S. Dist. LEXIS 227241 at *12 (S.D. Cal. Dec. 16, 2024).

2            C.    Exclusionary Sanctions

3                A party who has . . . responded to . . . request for production . . . must
                 supplement or correct its disclosure or response [] in a timely manner
4                if the party learns that in some material respect the disclosure or
                 response is incomplete or incorrect, and if the additional or corrective
5                information has not otherwise been made known to the other parties
                 during the discovery process or in writing[.]
6

7    Fed. R. Civ. P. 26(e)(1)(A) (emphasis added).  If a party fails to comply with Rule 26(e), "the

8    party is not allowed to use that information . . . to supply evidence on a motion . . . unless the

9    failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); see Goodman v.

10   Staples the Off. Superstore, LLC, 644 F.3d 817, 827 (9th Cir. 2011).  The party facing

11   exclusionary sanctions has the burden to show that its failure to comply was justified or harmless.

12   Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1107 (9th Cir. 2001).

13           Exhibit F will not be excluded because defendants do not identify which specific RFP it is

14   responsive to, the court is unable to independently determine which RFP they may be referring to,

15   and, to the extent Exhibit F is somehow responsive, the exclusionary rule does not apply because

16   plaintiff disclosed the information in Exhibit F during his deposition.  See ECF No. 22-6 at 51-52

17   (Plaintiff's Deposition ("Pl's Depo.") 25:20-26:9).  Moreover, because the documents in Exhibit

18   F can be judicially noticed, the court will take judicial notice of the proceedings in United States

19   v. Isamade, case no. 2:21-mj-0172 CKD (E.D. Cal. 2021) ("U.S. v. Isamade"), and, where

20   relevant, cite directly to those proceedings.  See Fed. R. Evid. 201(b) (a court may judicially

21   notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily

22   determined from sources whose accuracy cannot reasonably be questioned"); United States ex rel.

23   Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (The

24   court "may take notice of proceedings in other courts, both within and without the federal judicial

25   system, if those proceedings have a direct relation to matters at issue.") (citation and internal

26   quotation marks omitted) (collecting cases).

27           The court will not exclude Exhibit I and K because defendants do not identify which

28   specific RFP they are responsive to, and because it appears defendants already possessed these

                                                    4

documents and included them in their own exhibits.  <u>Compare</u> ECF No. 37 at 68, 74-75 <u>with</u> ECF No. 22-4 at 30, 37, 89.  The court, however, clarifies that to the extent plaintiff points to Exhibit K as the complaint histories of defendant Friedrichs and nondefendant Murphy, he is incorrect. Exhibit K consists of an incomplete photocopy set of defendants Solovyev's and Parker-Wright's complaint histories.  <u>Id.</u>

Defendants do not identify which specific RFP Exhibit Q is responsive to, nor can the court determine which one they may be referring to.  To the extent defendants claim Exhibit Q is responsive to RFP No. 7 based on plaintiff's written response regarding fabricated statements by defendant Friedrich and nondefendant Murphy, Exhibit Q does not support plaintiff's contention that defendant Solovyev contacted the Sacramento district attorney's office, or even that, as he claims, defendant Friedrichs and nondefendant Murphy's statements were fabricated.  Exhibit Q is therefore not responsive to RFP No. 7, and plaintiff was not required to produce it.

Exhibits J and L, however, will be excluded because they appear to be responsive to RFP Nos. 6, 8, 10, 12, and 18, plaintiff did not supplement his production with these records, and has not met his burden to show that failure to disclose these documents was justified or harmless.[3]

IV.    <u>Motion for Summary Judgment</u>

A.    <u>Overview</u>

Defendants argue that they are entitled to summary judgment because plaintiff cannot establish that defendants Parker-Wright and Solovyev were deliberately indifferent to his medical needs; that defendants Parker-Wright, Friedrichs, and Solovyev used excessive force; that defendant Solovyev discriminated against plaintiff based on race or religion; or that defendant Solovyev retaliated against plaintiff.  ECF No. 22-1 at 14-18, 21-23, 25-26.  Alternatively, defendants argue plaintiff's claims fail because defendants are entitled to qualified immunity, and/or plaintiff did not exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA").  <u>Id.</u> at 18-21, 23-25.[4]

---

[3]  As discussed below, consideration of Exhibits J and L would not change the recommended outcome.

[4]  Defendants simultaneously served plaintiff with notice of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure along with their motion for

1    Despite plaintiff's efforts to comply with Federal Rule of Civil Procedure 56(c)(1)(A) and

2    Local Rule 260(b), plaintiff has not strictly done so.  Nevertheless, because plaintiff is pro se, the

3    court will consider the record before it in its entirety.  See Thomas v. Ponder, 611 F.3d 1144,

4    1150 (9th Cir. 2010) (courts are to "construe liberally motion papers and pleadings filed by *pro se*

5    inmates and should avoid applying summary judgment rules strictly").  However, only those

6    assertions in the opposition which have evidentiary support in the record will be considered.

7    In opposition, plaintiff argues that he can establish deliberate indifference and that the

8    force used was more than necessary under the circumstances.  ECF No. 23-1 at 2; ECF No. 37 at

9    10-11, 14-15.  Plaintiff also raises several arguments regarding the conduct of individuals who are

10   not parties to this suit.  ECF No. 23-1 at 4, 6-7; ECF No. 37 at 12-14; Id. at 4-6 (Pl's Declaration

11   in Support of Opposition to MSJ ("Pl's Decl.") ¶¶ 16, 18-19, 23-29).  With respect to exhaustion,

12   plaintiff admits that he failed to exhaust his administrative remedies but argues it was due to fear

13   of retaliation.  ECF No. 23 at 12; ECF No. 37 at 12-14.  In response to his other claims, plaintiff

14   asserts defendants violated the Equal Protection Clause by depriving him of his property and

15   retaliating against him without due process.  Id. at 15-16.

16                **B.    Legal Standards for Summary Judgment**

17   Summary judgment is appropriate when the moving party "shows that there is no genuine

18   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

19   Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden

20   of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627

21   F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The

22   moving party may accomplish this by "citing to particular parts of materials in the record,

23   including depositions, documents, electronically stored information, affidavits or declarations,

24   stipulations (including those made for purposes of the motion only), admissions, interrogatory

25   answers, or other materials" or by showing that such materials "do not establish the absence or

26   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

27   _____

28   summary judgment.  ECF No. 22-3; see Klingele v. Eikenberry, 849 F.2d 409, 411 (9th Cir.
     1988) (pro se prisoners must be provided with notice of the requirements for summary judgment).

6

1  support the fact." Fed. R. Civ. P. 56(c)(1).

2      "Where the non-moving party bears the burden of proof at trial, the moving party need

3  only prove that there is an absence of evidence to support the non-moving party's case." Oracle

4  Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).

5  Indeed, summary judgment should be entered, "after adequate time for discovery and upon

6  motion, against a party who fails to make a showing sufficient to establish the existence of an

7  element essential to that party's case, and on which that party will bear the burden of proof at

8  trial." Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element

9  of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.  In such

10  a circumstance, summary judgment should "be granted so long as whatever is before the district

11  court demonstrates that the standard for the entry of summary judgment, as set forth in Rule

12  56(c), is satisfied." Id.

13      If the moving party meets its initial responsibility, the burden then shifts to the opposing

14  party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

15  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In attempting to establish the

16  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

17  of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

18  admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

19  Civ. P. 56(c).  The opposing party must demonstrate that the fact in contention is material, i.e., a

20  fact "that might affect the outcome of the suit under the governing law," and that the dispute is

21  genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving

22  party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

23      In the endeavor to establish the existence of a factual dispute, the opposing party need

24  not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed

25  factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

26  truth at trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

27  1987) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).  Thus,

28  the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to

see whether there is a genuine need for trial." <u>Matsushita</u>, 475 U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." <u>Walls v. Cent. Contra Costa Transit Auth.</u>, 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586 (citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Id.</u> at 587 (quoting <u>First Nat'l Bank</u>, 391 U.S. at 289).

C.    <u>Video Evidence</u>

Several facility cameras and one handheld camera captured the events that transpired in Six East 100 Pod ("dayroom"), Six East classroom/multipurpose room ("classroom"), the female safety cell ("safety cell"), and movements to and from each location on December 2 and 3, 2021. Two facility cameras outside of Six East 100 Pod captured deputies responding to the dayroom. ECF No. 22-8 (6E 6-19 6 East Indoor Rec Towards 300 Pod ("6E Towards 300 Pod")), (6E 6-20 6 East Indoor Rec Towards Control ("6E Towards Control")).  Three facility cameras recorded ten minutes inside the dayroom, which includes defendant Friedrichs' interaction with plaintiff. ECF No. 22-8 (6E 6-15 6 East Indoor Rec ("6E Indoor Rec")), (6E 0621 6 East 100 Middle), (6E 0622 6 East 100 Looking Towards Entry ("6E 100 Towards Entry")).

Three facility cameras and a handheld camera recorded plaintiff in the classroom.  Two facility cameras captured plaintiff being escorted into and out of the classroom and the entire time plaintiff was in the classroom.  <u>Id.</u> (Video 6E 0619 6 East Indoor Rec Visit ("6E Visit") at 04:26-32:29), (6E Towards 300 Pod at 03:33-31:22).  A third facility camera recorded only who entered and existed the classroom.  <u>Id.</u> (6E Towards Control at 03:33-31:25).  A handheld camera began to record approximately twenty minutes after plaintiff entered the classroom, and five seconds

1  after defendant Solovyev entered to speak to plaintiff. Id. (6E Indoor Rec Towards Control at

2  23:33), (6E Visit at 24:21-24:26), (Handheld Video MVI_0145 ("Handheld") at 00:00-10:29).

3  The handheld and facility camera recordings overlap for approximately eight minutes, id.

4  (Handheld at 00:00-08:09), (6E Visit at 24:26-32:27), (6E Towards 300 Pod at 23:33-31:22), (6E

5  Towards Control at 23:33-31:13). The handheld camera also recorded plaintiff's escort to the

6  safety cell. Id. (Handheld at 07:40-10:29).

7        Three facility cameras and a handheld camera recorded the incident from inside and

8  outside the safety cell. The handheld camera recorded defendant Solovyev wheel plaintiff into

9  the safety cell and leave him there. Id. (Handheld 09:58-10:29). One facility camera captured the

10 ninety-six minutes plaintiff was in the safety cell. Id. (BK59 Female Safety Cell ("Safety Cell")

11 at 04:24-1:40:44). Two facility cameras recorded approximately eleven out of ninety-six minutes

12 from outside the safety cell. Id. (BK52 Female Bkg Loop Part 1 ("Female Bkg 1") at 04:09-

13 10:01), (BK52 Female Bkg Loop Part 2 ("Female Bkg 2") at 00:00-05:03). Lastly, two facility

14 cameras captured plaintiff's escort to the ambulance. Id. (Video 0022.1 Garage Scanner at 11:12-

15 11:51), (Video Vehicle SP Central Control Entry at 11:12-11:58).

16        D.    Discussion

17              i.    Fourteenth Amendment Medical Deliberate Indifference Claims

18                   1.    Legal Standard[5]

19        To establish a violation under the Fourteenth Amendment for deliberate indifference to a

20 pretrial detainee's medical needs, the pretrial detainee must show:

21                   (1) the defendant made an intentional decision with respect to the
                     conditions under which the plaintiff was confined [including a
22                   decision with respect to medical treatment]; (2) those conditions put
                     the plaintiff at substantial risk of suffering serious harm; (3) the
23                   defendant did not take reasonable available measures to abate that

24  _____

5 Although defendants' motion for summary judgment applies the Fourteenth Amendment
25 standard for deliberate indifference, defendants switch to the Eighth Amendment standard in their
   reply due to plaintiff's application of the Eighth Amendment in his opposition. See ECF No. 22-
26 1 at 15-17; ECF No. 37 at 11-12; ECF No. 40 at 2-3. Because the evidence shows plaintiff was a
   pretrial detainee at the time of the alleged incidents, see ECF No. 22-4 at 79-80 (Pl's Arrest
27 History and Summary, DEF 00076-77), the court applies the Fourteenth Amendment standard.
   Bell v. Wolfish, 441 U.S. 520, 535-36 (1979) (the rights of pretrial detainees, detainees who have
28 not yet been convicted of a crime, arise under the Fourteenth Amendment).

9

1
2
3

> risk, even though a reasonable official in the circumstances would
> have appreciated the high degree of risk involved—making the
> consequences of the defendant's conduct obvious; and (4) by not
> taking such measures, the defendant caused the plaintiff's injuries.

4  Sandoval v. County of San Diego, 985 F.3d 657, 669 (9th Cir. 2021) (quoting Gordon v. County

5  of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018) (alteration in original)).  "To satisfy the third

6  element, the plaintiff must show that the defendant's actions were 'objectively unreasonable,'

7  which requires a showing of 'more than negligence but less than subjective intent—something

8  akin to reckless disregard.'"  Id. (quoting Gordon, 888 F.3d at 1125).  Although "reckless

9  disregard" requires something less than a subjective culpable state of mind, "[t]he 'reckless

10  disregard' standard is a formidable one."  Fraihat v. U.S. Immgr. & Customs Enf't, 16 F.4th 613,

11  636 (9th Cir. 2021) (citations omitted).

12
13
14
15

> Neither 'mere lack of due care,' nor 'an inadvertent failure to provide
> adequate medical care,' nor even '[m]edical malpractice,' without
> more, is sufficient to meet this standard.  Instead, a plaintiff must
> show that the defendant 'disregard[ed] an excessive risk" to the
> plaintiff's health and safety by failing to take 'reasonable and
> available measures' that could have eliminated that risk.

16  Id. (citations omitted).

17  ## 2.  Relevant Undisputed Facts[6]

18  ### a.  Background

19      On November 9, 2021, plaintiff was arrested and three days later he was ordered released.

20  U.S. v. Isamade, ECF Nos. 2, 3.  On November 22, 2021, plaintiff was arrested and charged with

21  eleven different penal code and vehicle violations and taken to Sacramento Jail ("Sac Jail").

22  DSUF ¶ 1; ECF No. 22-4 at 80 (Pl's Arrest Summary, DEF 00077).  Upon arrival at Sac Jail,

23  Adult Correctional Health ("ACH") conducted an intake, at which point, plaintiff informed ACH

24  that he suffers from Schizophrenia and Bipolar disorders and takes medication for his diagnoses.

25
26
27
28

---

[6] Plaintiff disputes *all* facts but does not provide citation to evidence to dispute *each* fact.
Accordingly, the undisputed facts sections throughout the undersigned's findings and
recommendations only excluded those facts not supported by defendants' evidence or for which
there is contrary evidence.
   This particular section only contains undisputed facts relevant to plaintiff's medical deliberate
indifference claims.

1    DSUF ¶ 2.  On November 24 and 26, ACH tried to confirm plaintiff's mental health diagnoses

2    and prescriptions but were unable to do so.  DSUF ¶ 2.  Between November 22, 2021, and

3    December 2, 2021, plaintiff did not receive psychotropic medication.  See ECF No. 22-5 at 16

4    (Tianna Hammock Declaration ("Hammock Decl.") ¶ 10).

5                                                     b.  Dayroom Incident

6           On December 2, 2021, defendant Parker-Wright, a Senior Records Officer ("SRO"),

7    informed plaintiff that he had fifteen minutes of dayroom time.  DSUF ¶ 3.  On that day, she was

8    responsible for monitoring the cameras of the Six East 100 Pod from the B control room,

9    instructing inmates to lockdown after dayroom time, and answering intercom communications.

10   Id.  She did not physically handle inmates.  Id.; ECF No. 22-7 at 30-31 (Pl's Depo. 67:23-68:2).

11          While plaintiff was on the phone in the dayroom, defendant Parker-Wright turned off his

12   phone access.  ECF No. 22-4 at 255 (Declaration of Aliaya Parker-Wright ("Parker-Wright

13   Decl.") ¶¶ 9-10); ECF No. 37 at 2 (Pl's Decl." ¶ 8).  Plaintiff returned to his cell, pressed the

14   medical emergency button, which can also be used for nonemergency reasons, and spoke to

15   defendant Parker-Wright.  ECF No. 22-4 at 255 (Parker-Wright Decl. ¶ 11); ECF No. 37 at 3 (Pl's

16   Decl. ¶ 9).  Defendant Parker-Wright told plaintiff to close his cell door.  Id.  Plaintiff did not

17   comply.  ECF No. 22-4 at 255 (Parker-Wright Decl. ¶ 11); ECF No. 22-8 (6E Indoor Rec at

18   00:47-06:10).  For the next five minutes plaintiff did not close his cell door, walked in and out of

19   his cell, talked with another inmate in the dayroom, and/or stood in the doorway of his cell

20   holding the door wide open.  ECF No. 22-8 (6E Indoor Rec at 00:47-06:10).

21          Defendant Parker-Wright contacted Murphy,[7] informed him of the situation, and

22   contacted Five East control room for additional support.  DSUF ¶ 4; ECF No. 22-4 at 255

23   (Parker-Wright Decl. ¶ 13).  Mora and defendant Friedrichs responded.  DSUF ¶ 4.  While

24   scanning the cameras, defendant Parker-Wright saw plaintiff make advances towards Six East

25   100 Pod door to exit, when he was directed to return to his cell, and plaintiff get down on his

26   knees when Murphy, Mora, and defendant Friedrichs approached him.  DSUF ¶¶ 6-7; ECF No.

27   ───────────────
28   [7]  The absence of the word "defendant" immediately before a name indicates the individual was
     involved but is not a defendant in this case.

                                                            11

1    22-4 at 255-256 (Parker-Wright Decl. ¶ 14).  A few seconds later, a struggle between plaintiff and

2    Murphy, Mora, and defendant Friedrichs ensued.  ECF No. 22-8 (6E Indoor Rec at 6:54-07:00),

3    (6E 100 Towards Entry 06:54-07:00).  Defendant Parker-Wright made a 415-deputy involved

4    call.  ECF No. 22-4 (Parker-Wright Decl. ¶ 16).  Eighteen additional deputies[8] responded, but

5    only four provided additional assistance in restraining plaintiff.  ECF No. 22-8 (6E Indoor Rec at

6    07:18-08:24), (6E 100 Towards Entry at 07:17-08:14).  Plaintiff was brought to his feet and

7    escorted out of the dayroom.  DSUF ¶¶ 9, 11; ECF No. 22-8 (6E Indoor Rec at 08:24-08:36), (6E

8    100 Towards Entry at 08:25-08:36), (6E Towards Control at 02:40-03:33).  Deputies did not

9    touch plaintiff's neck or throat in the dayroom.  DSUF ¶ 10; ECF No. 22-7 at 30-33, 47 (Pl's

10    Depo. 68:6-70:15, 84:5-15).  Defendant Parker-Wright's involvement in the matter ended once

11    plaintiff was in the classroom.  DSUF ¶ 4; ECF No. 22-4 at 256 (Parker-Wright Decl. ¶ 17).

12                                    c.    Classroom Incident

13            On December 2, 2021, defendant Solovyev, a deputy, working in male booking responded

14    to a 415-deputy involved fight initiated by defendant Parker-Wright.  DSUF ¶ 12.  As a WRAP

15    cart instructor, he brought with him a WRAP restraint cart.  Id.

16            Defendant Solovyev did not witness the incident in the dayroom.  Id.  When defendant

17    Solovyev arrived, plaintiff was already seated in the classroom and had not been kneed, hit, beat,

18    or struck by anyone.  Id.; ECF No. 22-8 (6E Visit at 04:28-06:33); ECF No. 22-7 at 30-33, 47

19    (Pl's Depo. 68:6-70:15, 84:5-15).  Defendant Solovyev's interaction with plaintiff started

20    eighteen minutes later.  ECF No. 22-8 (6E Visit at 06:33-24:21).

21            Because plaintiff refused to comply with defendant Solovyev's instructions to stand up

22    and walk to his new housing unit, defendant Solovyev requested the WRAP cart and Amaya and

23    Tibbs lowered plaintiff to the ground.  Id.  (Handheld at 00:00-01:45).  Two deputies strapped

24    plaintiff's ankles together.  Id.  Plaintiff moved his head from side to side without any issue.  Id.

25    Plaintiff was lifted and placed in the WRAP cart.  Id. (Handheld 02:16-02:34).  As plaintiff was

26    wheeled to exit the classroom, plaintiff tried to eject himself off the cart.  DSUF ¶ 15; ECF No.

27

28    _____

    [8]  General references to "deputies" are used as a catchall for unidentified individuals in uniform.

22-8 (Handheld 02:40-02:43).  Defendant Solovyev and two other deputies held him down.
DSUF ¶ 15; ECF No. 22-8 (Handheld 02:40-02:43).  DSUF ¶ 15; ECF No. 22-8 (Handheld at
02:43-02:58).  Plaintiff turned towards Solovyev, opened his mouth, made a biting gesture
towards him, and said "I'm about to bite you."  DSUF ¶ 15; ECF No. 22-8 (Handheld at 02:50-
02:52).  Amaya and defendant Solovyev decided to use the full WRAP restraint.[9]  Id. (Handheld
at 02:48-02:55).  The officers lifted plaintiff out of the cart, placed him on the ground, and turned
him on his stomach.  Id. (Handheld 03:04-03:06).  While on his stomach, plaintiff freely lifted his
head and talked directly to the camera.  Id.

A nurse was called.  Id. (Handheld 04:08-04:14).  Plaintiff complained that a nurse should
have been called sooner and that he was being treated this way because of his mental health.  Id.
(Handheld 04:29-04:37).  The chest restraint was added, plaintiff was lifted into the WRAP cart,
handcuffed to the cart, and a helmet was secured on his head.  Id. (Handheld at 04:10-05:52).  A
nurse checked plaintiff's restraints.  Id. (Handheld at 06:19-07:32).  Plaintiff told the nurse he did
not need to check the leg restraint because it was "all good" and it was "very comfortable."  Id.
(Handheld 06:22-06:44).  The nurse responded, "I have to worry about it" and continued to
examine plaintiff.  Id. (Handheld 06:50-07:32).

Plaintiff did not express any concerns regarding his mental health or any injury to the
nurse.  Id. (06:19-07:32).  During the entire time plaintiff was in the classroom, no one placed
their knee(s) on or around plaintiff's neck, throat, or upper body, or otherwise hit, beat, or struck
him.  Id. (6E Visit at 04:27-32:09), (Handheld, 00:00-10:29).  Plaintiff showed no signs of
bleeding in his mouth or throat when he was in the classroom with defendant Solovyev.  Id.

d.  Safety Cell Incident

Defendant Solovyev wheeled plaintiff into the safety cell.  Id. (Handheld at 09:58).
Plaintiff asked, "Can you please leave me in here with this cart chained like this?"  Id. (Handheld
at 10:06-10:10).  Tibbs responded, "yes."  Id.  Plaintiff said it's a violation of his rights but then
told them to leave him there overnight.  Id. (Handheld at 10:18-10:21).  The cell door was closed.

---

[9]  The WRAP restraint consists of an ankle strap, leg and chest retraining devices, a helmet and a
cart.  ECF No. 22-5 at 1 (Solovyev's Decl. ¶ 11).

1    Id. (Handheld at 10:23), (Safety Cell at 04:50).  There were still no signs of blood.  Id.

2        Because plaintiff was in a WRAP restraint, he was monitored at least twice every thirty

3    minutes.  DSUF ¶ 18.  During the first forty-seven minutes, plaintiff was checked on four times.

4    ECF No. 22-8 (Safety Cell at 08:57-09:00, 18:45-19:04, 36:37-36:53, 51:09-51:34; ECF No. 22-4

5    at 117 (Custody log, DEF 00114 ("Custody Log")) (2305, 2315, 2331, 2347 entries).  After his

6    first check, plaintiff tried to get out of his restraints and started to spit on the wall.  ECF No. 22-8

7    (Safety Cell at 13:24-18:45).  During his second check, plaintiff tried to talk to the person, but

8    they were only there for about twenty seconds.  Id. (Safety Cell at 18:45-19:04); see also 22-4 at

9    117 (Custody Log, 2315 entry).  For the next sixteen minutes, plaintiff spat, coughed, and yelled

10   on and off, before a third check was done.  Id. (Safety Cell at 19:14-36:37); see also 22-4 at 117

11   (Custody Log) (2331 entry).  For the next sixteen minutes, plaintiff spat, coughed, and

12   maneuvered the cart so that his feet were touching the cell door.  ECF No. 22-8 (Safety Cell at

13   41:44-51:02).  During his fourth check, he started to talk and continued to talk for the next twelve

14   minutes, through his fifth and sixth checks.  Id. (Safety Cell at 51:09-1:03:50); ECF No. 22-4 at

15   117 (Custody Log) (2347, 2352, and 0000 entries).  By then, the wall was covered in blood.  ECF

16   No. 22-6 at 60 (Pl's Depo. 34:11-24); ECF No. 22-4 at 207 (Solovyev's Interview, p.8).

17       Thirteen minutes after his fourth check began, a nurse entered the hallway outside the cell

18   and waited for deputies to escort him to examine plaintiff.  ECF No. 22-8 (Safety Cell at 1:03:44-

19   1:08:33), (Female Bkg 2 at 1:05-05:02).  Four minutes later, Amaya and Tibbs entered the safety

20   cell with a nurse and the nurse examined plaintiff's mouth with a light.  Id. (Safety Cell at

21   1:08:33-1:09:88).  The nurse and plaintiff talked, the nurse grabbed a tongue depressor, and

22   plaintiff shook his head; the nurse returned the tongue depressor without using it and lowered a

23   spit mask over plaintiff's mouth.  Id. (Safety Cell at 1:09:12-1:11:53).  The nurse continued to

24   examine plaintiff, including the exterior of his throat and neck area, before leaving.  Id. (Safety

25   Cell at 1:11:53-1:16:41).  After the nurse left, plaintiff and Amaya spoke for about three minutes,

26   the cell door closed and reopened twenty minutes later when Amaya and Solovyev entered to

27   wheel plaintiff out of the cell.  Id. (Safety Cell at 1:17:06-1:40:56).

28   ////

e. <u>Sutter Medical Center Emergency Department</u>

Plaintiff was transported by ambulance to the Sutter emergency department.  <u>Id.</u> (Garage at 11:12-11:51), (Central Control Entry at 11:12-11:58); ECF No. 22-5 at 33 (Sutter Medical Records ("Medical Records"), p.8).  Plaintiff arrived at the hospital on December 3, 2021, at 12:57am and was discharged at 4:52am.  ECF No. 22-5 at 34 (Medical Records, p.9).

Plaintiff reported he "was knelt on around the posterior neck to be restrained" and that "[h]e started spitting up blood and having pain to the left neck. No dyspnea. No chest pain."  <u>Id.</u> at 38 (Medical Records, p.13).  Review of plaintiff's systems, including throat, respiratory, and psychiatric, were all normal.  <u>Id.</u> at 39-40 (Medical Records, p.14-15).  The following observations were recorded: "Negative for . . . sore throat, trouble swallowing and voice change"; "Respiratory: Negative for cough, shortness of breath and wheezing"; "CT shows no vascular injury nor acute traumatic abnormality"; "CTA of neck shows no traumatic injuries"; "no further episodes of spitting up blood"; "remained without any symptoms, had no change to voice";  "[n]o evidence of vascular injury"; and "[n]o large vessel occlusion or significant stenosis."  <u>Id.</u> at 39, 41-42, 44, 55 (Medical Records, pp. 14, 16-17, 19, 30).

Plaintiff also reported he was not receiving his psychiatric medication in jail and would like them because it is causing him distress.  <u>Id.</u> at 41 (Medical Records, p.16).  On December 3, 2021, plaintiff was administered a one-time dose of medications for schizophrenia and acetaminophen (Tylenol).  <u>Id.</u>; DSUF ¶ 2.

Plaintiff was discharged without any prescriptions.  ECF No. 22-5 at 42 (Medical Records, p. 17).  On December 7, 2021, ACH started psychotropic medications for plaintiff.  <u>Id.</u>

3. <u>Analysis</u>

a. <u>Claim Against Defendant Parker-Wright</u>

i. <u>Intentional decision</u>

Defendants argue that plaintiff cannot establish that defendant Parker-Wright made an intentional decision with respect to the conditions under which plaintiff was confined as it relates to his schizophrenic disorder.  ECF No. 22-1 at 15-16.  Plaintiff responds that (1) "Defendants made an intentional decision to subdue, fight, apply control holds to plaintiff, slam plaintiff from

1  a seated position to the ground even after plaintiff took a seated position, raised his hand in the air

2  and clear and clearly declared 'I give up, I surrender," and (2) "Defendants willfully pinned

3  plaintiff to the wall, placed plaintiff in a WRAP device."  ECF No. 37 at 9-10.

4          For medical deliberate indifference, the *conditions* at issue are those related to plaintiff's

5  medical care.  Cf. Kingsley v. Hendrickson, 576 U.S. 389 (2015) (Fourteenth Amendment

6  standard for excessive force claims); Castro v. County of Los Angeles, 833 F.3d 1060 (9th Cir.

7  2016) (Fourteenth Amendment standard for failure to protect); Gordon, 888 F.3d 1118

8  (Fourteenth Amendment standard for inadequate medical care).  Because none of the intentional

9  acts described by plaintiff relate to the conditions of his medical care, they are best addressed

10  under his excessive force claims.

11          With respect to defendants' argument, the court agrees there is no evidence that defendant

12  Parker-Wright was involved in any decision regarding plaintiff's medication for his mental health

13  or with respect to his mental health diagnosis.  Those decisions were made by ACH.

14          However, the evidence shows defendant Parker-Wright made an intentional decision to

15  contact custody staff instead of medical staff after plaintiff pushed the medical emergency button.

16  Accordingly, the court must assess whether plaintiff can establish the other three elements.

17                     ii.  Substantial risk of suffering serious harm

18          Defendants argue that plaintiff cannot establish that defendant Parker-Wright put plaintiff

19  at substantial risk of suffering serious harm when she disconnected his phone call, requested

20  deputy assistance in locking him down in his cell, and called a 415 deputy involved fight *because*

21  *she did not know* plaintiff was without medication and that ending the call would induce a mental

22  health crisis, she did not call a 415 deputy involved fight until a physical altercation broke out,

23  and plaintiff has no evidence that cutting off his phone access, on its own, could induce a mental

24  health crisis.  ECF No. 22-1 at 16.  It appears defendants conflate the second and third elements.

25          What defendant knew or should have known is not at issue under the second element; it is

26  an issue under the third element and therefore will be discussed in the next section.  Russell v.

27  Lumitap, 31 F.4th 729, 739 (9th Cir. 2022) (discussing the differences between the second and

28  third elements of the Fourteenth Amendment deliberate indifference standard).  Relevant here is

1  whether plaintiff can establish that he had a "serious medical need" at the time of the incident.

2  Russell, 31 F.4th at 739 (For a "substantial risk of serious harm" for medical deliberate

3  indifference, there must be a "serious medical need.").  A "serious medical need" "is an objective

4  standard, and includes the existence of an injury that a reasonable doctor or patient would find

5  important and worthy of comment or treatment; the presence of a medical condition that

6  significantly affects an individual's daily activities; or the existence of chronic and substantial

7  pain."  Id.

8      Plaintiff has not established a material dispute with respect to whether he suffered a

9  "serious medical need."  Although the evidence shows that plaintiff did not receive psychotropic

10  medications while in Sac Jail custody from November 22, 2021, through December 2, 2021,

11  received one-time administration of psychotropic medications on December 3, 2021, while at

12  Sutter Medical Center ("Sutter"), and started to receive psychotropic medications on December 7,

13  2021, plaintiff has not put forth medical testimony or records that prior to or during the December

14  2, 2021 incident he suffered from a schizophrenic, bipolar, or any other mental health disorder

15  that required medication at that time.  The lack of psychotropic medication for eleven days,

16  without a demonstrated need for it, does not create a substantial risk of harm.

17      Moreover, to the extent plaintiff claims that defendant Parker-Wright's decisions to

18  terminate his phone access, contact custody staff after he pushed the medical emergency button,

19  and/or make a 415-deputy involve call created a substantial risk of a panic and/or anxiety attack

20  or other mental health crisis, he fails to provide evidentiary support.  Contrary to plaintiff's

21  assertion, ECF No. 37 at 11, the video evidence does not provide evidence from which a

22  reasonable jury could conclude that plaintiff was having a medical or psychiatric emergency (i.e.

23  had a serious medical need), see ECF No. 22-8 (6E Indoor Rec at 00:45-06:09), nor does pressing

24  a medical emergency button, which can also be used for nonemergency purposes, twenty to thirty

25  times, see ECF No. 1 at 3; ECF No. 22-7 at 16-17 (Pl's Depo. 53:6-54:3).  Accordingly, plaintiff

26  cannot satisfy the second element.

27                    iii.   Objective Reasonableness

28      Defendants argue that plaintiff cannot establish defendant Parker-Wright acted in an

1  objectively unreasonable manner because *she did not know* plaintiff suffered from a

2  schizophrenic or panic/anxiety disorder and was without medication for eleven days, that ending

3  his phone access would induce a mental health crisis, and/or that he was having a mental health

4  crisis after she terminated his phone access.  ECF No. 22-1 at 16; ECF No. 40 at 2-3.  In

5  opposition, plaintiff may be attempting to argue that because he disclosed his mental health

6  diagnoses and medications to Sac Jail when he was arrested on November 9 and 22, defendant

7  Parker-Wright knew or should have known he suffered from mental health disorders and that he

8  had been without medication for eleven days.  ECF No. 23 at 2; ECF No. 23-1 at 1-2; ECF No. 37

9  at 11 (Pl's Opposition Brief), 18 (Response to DSUF ¶ 2), at 30 (Pl's Statement of Disputed Facts

10  ("PSDF") ¶¶ 2-4).

11       Because there is confusion in the briefing with respect to what culpable state of mind is

12  required under the Fourteenth Amendment, see id.; ECF No. 37 at 11, it is worth clarifying that

13  while the Eighth Amendment requires that the defendant be subjectively "aware of facts from

14  which the inference could be drawn that a substantial risk of serious harm exists, and he must also

15  draw the inference," the objectively reasonableness test under the Fourteenth Amendment does

16  not require either subjective element.  Castro, 833 F.3d at 1071.  Instead, the objectively

17  reasonableness test asks what a *reasonable* officer in defendant's position would have known,

18  inferred, and done under the circumstances.  See e.g., Sandoval, 985 F.3d at 670 (finding that a

19  reasonable jury could conclude that a reasonable nurse who was told that Sandoval was shaking,

20  tired, and disoriented—and who was specifically directed by a deputy to evaluate Sandoval 'more

21  thoroughly,'" as defendant de Guzman was, "would have understood that Sandoval faced a

22  'substantial risk of suffering serious harm'").  Here, plaintiff fails to put forth evidence that could

23  support a conclusion a reasonable officer in defendant Parker-Wright's position would have

24  known or should have known that disconnecting plaintiff's phone access would cause a mental

25  health crisis—especially where the officer's duties have nothing to do with ACH and the officer

26  is unaware, and has no basis from which to draw an inference, that plaintiff has mental health

27  conditions and/or has been without psychiatric medication for eleven days.

28       In opposition, plaintiff argues that defendant Parker-Wright knew of his serious medical

1  need based on camera footage showing that plaintiff returned to his cell and pressed the medical

2  button multiple times, ECF No. 37 at 11, and because he spoke to her and requested medical.

3  ECF No. 37 at 3 (Pl's Decl. ¶9). However, the video evidence does not confirm the number of

4  times plaintiff pressed the emergency button. ECF No. 22-8 (6E Indoor Rec at 00:48-06:25), (6E

5  100 Middle at 00:48-06:25), (6E 100 Towards Entry at 00:48-06:25). And even if it did, and if

6  plaintiff told defendant Parker-Wright that he needed medical assistance, he cannot show that a

7  reasonable officer scanning the cameras would have contacted medical staff, particularly where

8  no medical emergency was obvious. Moreover, this is not a situation where defendant Parker-

9  Wright did nothing. Defendant Parker-Wright took reasonable available measures to abate the

10  risk of serious harm to plaintiff by contacting custody staff. Custody staff arrived within five

11  minutes and spoke with plaintiff. If plaintiff was having a medical emergency, custody staff

12  could have called for medical staff after assessing the situation. Also, as defendants point out,

13  even if plaintiff was having a mental health crisis, a reasonable officer would have called custody

14  staff to secure plaintiff before medical staff could provide care.

15  Accordingly, plaintiff fails to establish a material dispute with respect to the third element.

16  iv.  <u>Causation</u>

17  Defendants argue that plaintiff cannot establish defendant Parker-Wright caused plaintiff's

18  injuries because his alleged injuries of being kneed on his throat or neck are unsubstantiated by

19  video evidence. ECF No. 22-1 at 15-17.[10] Defendants are correct. During plaintiff's deposition,

20  he testified that in the dayroom, while he was being restrained, the deputies "did not touch [his]

21  throat at all or nothing." Plaintiff testified that the *kneeing* occurred in the classroom after he was

22  escorted out of the dayroom and while *no cameras were on*, and that the deputies "had their *knees*

23  on [his] neck holding [him] down." ECF No. 22-7 at 31-33, 47 (Pl's Depo. 68:6-12, 68:22-70:15,

24  84:5-15) (emphasis added). Contrary to this testimony, there were four cameras that collectively

25  captured what transpired in the classroom, ECF No. 22-8 (6E Visit at 04:26-32:29), (6E Towards

26  _____

27  [10] Defendants also argue that plaintiff's causation argument is unclear because he takes issue
    with his medication being cut off cold turkey, which was a decision by ACH, not defendant
    Parker-Wright. ECF No. 40 at 3. Because it's unnecessary, the court does not address this

28  argument.

1 | 300 Pod at 03:33-31:22), (6E Towards Control at 03:33-31:25), (Handheld 00:00-08:09), and the

2 | video evidence irrefutably shows that no person in the classroom put their knee(s) on and/or

3 | otherwise hit or struck plaintiff's neck, throat, or upper body.  Id.  The only time someone

4 | touched plaintiff's neck in the classroom was to support plaintiff's neck when turning him over or

5 | on his side.  (Handheld at 02:17-02:21, 03:05-03:07, 03:51-04:08, 04:37-04:38).  Given the video

6 | evidence, no reasonable jury could believe plaintiff's version of events—that he was kneed, hit,

7 | and/or struck in the neck or throat on December 2, 2021, causing him to bleed from his

8 | esophagus—and as such, is rejected.  Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing

9 | parties tell two different stories, one of which is blatantly contradicted by the record, so that no

10 | reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

11 | ruling on a motion for summary judgment.").

12 |      Plaintiff argues that his medical records, the fact that he was taken to the hospital, and that

13 | the jail nurse found no lacerations or cuts in his mouth or lips proves the bleeding was caused by

14 | defendants.  ECF No. 23-1 at 2; ECF No. 37 at 10-11 (Opposition Brief), 26 (Response to

15 | DSUF ¶ 18).  However, the evidence merely supports plaintiff's argument that *he did not cause*

16 | his own injury, and confirms plaintiff was taken to the hospital, *he told* hospital staff that his neck

17 | was injured by custody staff, and no injury to his neck or throat was identified by medical staff.

18 | See ECF No. 22-5 at 39, 41-42, 44, 55 (Medical Records, p.14, 16-17, 19, 30).  The evidence

19 | does not establish the *cause* of the bleeding.[11]  Because defendants point to the absence of

20 | medical evidence as to this element, plaintiff was required to come forward with evidence to

21 | show he can meet his burden at trial.  He has not done so.

22 | ////

23 | ////

24 |

25 |

---

26 | [11]  As discussed above, plaintiff's Exhibit J is excluded under Federal Rule of Civil Procedure

27 | 37(c)(1).  The court notes, however, that Exhibit J does not establish an injury resulting from the incidents on December 2 or 3, 2021, or the *cause* of such injury.  It merely shows that in May 2023, plaintiff had a permanent CPAM mask; it does not explain why plaintiff had it and/or what

28 | it was meant to treat.

1              b.  <u>Claim Against Defendant Solovyev</u>[12]

2                      i.  <u>Intentional decision</u>

3          Defendants argue plaintiff cannot establish that defendant Solovyev instructed deputies to

4   ignore his medical needs.  ECF No. 22-1 at 17.  However, they fail to meet their burden on this

5   point.

6          Evidence shows a material dispute as to whether defendant Solovyev intentionally chose

7   to delayed medical care for plaintiff.  Defendants' reply and defendant Solovyev's declaration

8   suggests that he could not have acted with deliberate indifference to plaintiff's medical needs

9   when he was in the safety cell because defendant Solovyev did not interact with plaintiff after he

10  left him to be monitored by other deputies.  <u>See</u> ECF No. 22-5 at 1 (Solovyev Decl. ¶ 15); ECF

11  No. 40 at 4.  However, other evidence shows defendant Solovyev *subsequently* interacted with

12  plaintiff, ECF No. 22-8 (Handheld at 1:40:18-1:40:56); ECF No. 22-6 at 60-61 (Pl's Depo. 34:25-

13  35:8), and creates a material dispute as to whether defendant Solovyev, or someone else, spoke

14  with plaintiff while he was in the safety cell, saw the blood on the wall, and delayed contacting

15  medical staff.  ECF No. 22-4 at 99 (Report 2021-368714, Tibb's Narrative, DEF 00096) (deputy

16  Amaya badge #793), 117 (Custody Log) (2352 entry by badge #793), 207 (Case #2023PSB-557,

17  Solovyev Interview, DEF 00204) (Solovyev testified "the blood – covered the wall. . . . *We*

18  couldn't positively identify where the injury came from so they requests us to transport him to the

19  hospital for a future – or for further evaluations."); ECF No. 22-6 at 60 (Pl's Depo. 34:11-24)

20  (plaintiff testified that, during a welfare check, he saw a masculine figure that looked like

21  defendant Solovyev and he said something like "Oh, leave him in there.  He bit his tong [sic].  He

22  bit his lips.  That's where the blood is coming from," and that a nurse was not contacted until his

23  next welfare check.").  Because defendants only provide eleven of the ninety-six minutes of video

24  evidence from outside the safety cell, <u>see</u> ECF No. 22-8 (Safety Cell at 04:24-1:40:44), (Female

25  Bkg 1 at 04:10:01), (Female Bkg 2 at 00:00-05:03), the court is unable to rule out the possibility

26

27  [12]  In opposition, plaintiff does not specifically address defendants' arguments regarding
    defendant Solovyev.  Nonetheless, the court addresses plaintiff's arguments to the extent they can
28  be interpreted to be directed at defendant Solovyev.

1   that defendant Solovyev, and not someone else, spoke with plaintiff and decided to hold off on

2   contacting medical.  Since the issue will turn on credibility, it is one for a jury.  Anderson v.

3   Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (At summary judgment, "[c]redibility

4   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

5   facts are jury functions, not those of a judge.").

6                               ii.   Substantial risk of serious harm

7       Defendants argue that plaintiff cannot establish a substantial risk of serious harm by a

8   decision that defendant Solovyev did not make.  ECF No. 22-1 at 18.  The court disagrees.

9   As noted above, there is a material dispute with respect to whether defendant Solovyev

10  intentionally delayed medical care for plaintiff while he was in the safety cell.

11      More importantly, the relevant issue here is whether a reasonable jury could find plaintiff

12  suffered from a serious medical need—"an injury that a reasonable doctor *or patient would find*

13  *important and worthy of comment* or treatment," Russell, 31 F.4th at 739 (emphasis added)—

14  where plaintiff was spitting up blood and coughing for approximately thirty eight minutes and

15  had covered the wall in blood by his fourth welfare check.  Viewing the evidence in the light

16  most favorable to plaintiff, the undersigned finds that a reasonable jury could reach that

17  conclusion.[13]

18                               iii.   Objective Reasonableness

19       Defendants argue that defendant Solovyev's intentional decision to place plaintiff in a

20  safety cell shows that his conduct was not unreasonable because plaintiff received heightened

21  monitoring in the safety cell.  ECF No. 22-1 at 18.  This point, the court agrees.

22      It was not objectively unreasonable for defendant Solovyev to put plaintiff in a safety cell

23  in a WRAP restraint.  Plaintiff exhibited signs that he was a danger to *himself* and/or others.  See

24  ECF No. 22-4 at 259 – ECF No. 22-5 at 1 (Solovyev Decl. ¶ 10); ECF No. 22-8 (Handheld 02:48-

---

[13]  To the extent plaintiff asserts he was at "substantial risk of serious harm" because he was
wrapped head-to-toe, cuffed, and left in a safety cell for ninety-six minutes, see ECF No. 37 at 10,
the video evidence contradicts his assertion.  The lower part of plaintiff's legs were wrapped and
a chest restraint secured his upper body to his lower body, but plaintiff's head was not restrained,
plaintiff could move his upper body side to side and forward, and he was seated in a primarily
upright position.  See ECF No. 22-8 (Handheld 03:40-10:29), (Safety Cell at 04:50-1:40:56).

02:55).  Defendant Solovyev took reasonable available measures to minimize the risk to plaintiff by having a nurse check his restraints, ECF No. 22-8 (Handheld at 05:45-07:32), and by placing him in a safety cell where he would be monitored.  ECF No. 22-4 at 117 (Custody Log); ECF No. 22-5 at 1 (Solovyev Decl. ¶ 13); ECF No. 22-8 (Safety Cell at 04:50-1:40:56).  Plaintiff was not kneed, hit, or struck in the neck, throat, or upper body, did not complain of any pain, was not bleeding, and did not exhibit any evidence of injury before he was left in the safety cell.  Based on all of this, a reasonable official in defendant Solovyev's position would not have appreciated that there was a high degree of risk that plaintiff would bleed from the mouth or throat and/or choke on his blood when he was left in the safety cell in the WRAP restraint.

However, viewing the evidence in the light most favorable to plaintiff, defendants have not shown it was objectively reasonable to delay medical examination for seventeen minutes. Video evidence shows a lack of urgency—a nurse casually walks into the hallway and hangs back for minute while the deputies do the same before entering to examine plaintiff seventeen minutes after his fourth check—despite the presence of a substantial amount of blood and an unknown source of the blood.  Because a reasonable jury could find defendant Solovyev was the person plaintiff spoke to during his fourth check, they could also find, as plaintiff asserts, that defendant Solovyev's failure to communicate the seriousness of the situation and delay medical care was objectively unreasonable.[14]  See ECF No. 23 at 11; ECF No. 23-1 at 2; ECF No. 37 at 11.

### iv.  Causation

Nevertheless, plaintiff's medical deliberate indifference claim against defendant Solovyev fails because plaintiff has not identified evidence that could support the fourth element.  The parties' arguments with respect to causation for defendant Solovyev are the same as those discussed with respect to defendant Parker-Wright.  See ECF No. 22-1 at 17-18; ECF No. 37 at 10-11.  For the reasons discussed above, the court reaches the same conclusion—plaintiff has failed to put forth evidence that defendant Solovyev's intentional acts *caused* plaintiff's bleeding and/or any other injury.

---

[14]  DSUF ¶ 18 claims a nurse was *called* at 12:07am but none of the evidence cited supports this statement, and none of the evidence establishes when the nurse was *called*.

1    4.    Conclusion

2         Defendants' motion for summary judgment on plaintiff's medical deliberate indifference

3    claims should be granted because plaintiff has had adequate time for discovery and fails to make

4    a showing sufficient to establish the existence the second, third, and fourth elements for his claim

5    against defendant Parker-Wright and the fourth element for his claim against defendant Solovyev.

6    Oracle Corp., 627 F.3d at 387 ("Where the non-moving party bears the burden of proof at trial,

7    the moving party need only prove that there is an absence of evidence to support the non-moving

8    party's case." (citing Celotex, 477 U.S. at 325)).    Considering this recommendation, the court

9    declines to address defendants' exhaustion and qualified immunity defenses to these claims.

10         ii.    Fourteenth Amendment Excessive Force Claims

11              1.    Legal Standard

12         Under the Fourteenth Amendment, "a pretrial detainee must show only that the force

13    purposely or knowingly used against him was objectively unreasonable." Kingsley v.

14    Hendrickson, 576 U.S. 389, 396-97 (2015).    "[O]bjective reasonableness turns on the 'facts and

15    circumstances of each particular case'" and must be determined "from the perspective of a

16    reasonable officer on the scene, including what the officer knew at the time, not with the 20/20

17    vision of hindsight." Id. at 397 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).    "A court

18    must also account for the 'legitimate interests that stem from [the government's] need to manage

19    the facility in which the individual is detained." Id. (citing Bell v. Wolfish, 441 U.S. 520 (1979)).

20
21
22
23

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: [1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting.

24    Id. at 397.    Whether the individual "posed an immediate threat to the safety of the officers or

25    others" is the most important consideration.    Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir.

26    2011) (citing Graham, 490 U.S. at 396).    "[A] simple statement by an officer that he fears for his

27    safety or the safety [of] others is not enough; there must be objective factors to justify such a

28    concern." Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010) (citation and quotation

24

1   omitted).  The absence of a serious or significant injury is not outcome determinative.  See

2   Hudson v. McMillian, 503 U.S. 1, 4, 7 (1992) (holding that a serious injury is not necessary to

3   establish excessive force).

4         Excessive force cases often turn on credibility determinations, and "[the excessive force

5   inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw

6   inferences therefrom."  Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (alteration in

7   original) (quoting Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002)).  Therefore, "summary

8   judgment or judgment as a matter of law in excessive force cases should be granted sparingly."

9   Id. (quoting Santos, 287 F.3d at 853). The Ninth Circuit has repeatedly held "that the

10  reasonableness of force used is ordinarily a question of fact for the jury."  Liston v. County of

11  Riverside, 120 F.3d 965, 976 n.10 (9th Cir. 1997), as amended (October 9, 1997).

12                    2.  Excessive Force Claim Against Defendant Parker-Wright

13                         a.  Undisputed Facts

14        On December 2, 2021, defendant Parker-Wright was responsible for monitoring the

15  cameras of the Six East 100 Pod from the B control room, instructing inmates to lockdown after

16  dayroom time, and answering intercom communications.  DSUF ¶ 3.  She informed plaintiff he

17  had fifteen minutes of dayroom time.  Id.  While plaintiff was on the phone in the dayroom,

18  defendant Parker-Wright turned off his phone access.  ECF No. 22-4 at 255 (Parker-Wright Decl.

19  ¶¶ 9-10); ECF No. 37 at 2 (Pl's Decl. ¶ 8).  Plaintiff returned to his cell, pressed the medical

20  emergency button, which can be used for nonemergency reasons, and spoke to defendant.  ECF

21  No. 22-4 at 255 (Parker-Wright Decl. ¶ 11); ECF No. 37 at 3 (Pl's Decl. ¶ 9).  Defendant Parker-

22  Wright told plaintiff to close his cell door.  Id.  Plaintiff did not comply.  ECF No. 22-4 at 255

23  (Parker-Wright Decl. ¶ 11).  For the next five minutes plaintiff kept his cell door open and walked

24  in and out of his cell to the dayroom.  ECF No. 22-8 (6E Indoor Rec at 00:47-06:10).

25        Defendant Parker-Wright contacted Murphy, informed him of the situation, and contacted

26  Five East control room for additional support.  DSUF ¶ 4.  Mora and defendant Friedrichs

27  responded.  Id.  While scanning the cameras, defendant Parker-Wright saw plaintiff make

28  advances towards the exit after he was directed to return to his cell, and plaintiff get down on his

1    knees when Murphy, Mora, and defendant Friedrichs approached him.  DSUF ¶¶ 6-7; ECF No.

2    22-4 at 255-256 (Parker-Wright Decl. ¶ 14).  A few seconds later, a struggle ensued.  ECF No.

3    22-8 (6E Indoor Rec at 6:54-07:00), (6E 100 Towards Entry 06:54-07:00).  Defendant Parker-

4    Wright made a 415-deputy involved call.  ECF No. 22-4 (Parker-Wright Decl. ¶ 16).  Eighteen

5    additional deputies responded, but only four provided additional assistance in restraining plaintiff.

6    ECF No. 22-8 (6E Indoor Rec at 07:18-08:24), (6E 100 Towards Entry at 07:17-08:14).  Plaintiff

7    was escorted out of the dayroom.  DSUF ¶¶ 9, 11; ECF No. 22-8 (6E Indoor Rec at 08:24-08:36),

8    (6E 100 Towards Entry at 08:25-08:36), (6E Towards Control at 02:40-03:33).

9         Deputies did not touch plaintiff's neck or throat when they physically restrained plaintiff

10    in the dayroom.  DSUF ¶ 10; ECF No. 22-7 at 30-33, 47 (Pl's Depo. 68:6-70:15, 84:5-15).

11    Defendant Parker-Wright did not physically handle plaintiff, and her involvement in the matter

12    ended once plaintiff was in the classroom.  DSUF ¶¶ 3-4; ECF No. 22-4 at 256 (Parker-Wright

13    Decl. ¶ 17); ECF No. 22-7 at 30-31 (Pl's Depo. 67:23-68:2).

14                          b.  Analysis - Objective Reasonableness of Force Used

15         Defendants argue that plaintiff's excessive use of force claim against defendant Parker-

16    Wright fails because she did not physically touch plaintiff, and to the extent plaintiff argues that

17    making a 415 deputy involved fight call constitutes use of excessive force, it was not objectively

18    unreasonable for her to call a 415 deputy involved fight after plaintiff was involved in a physical

19    altercation with Murphy, Mora, and defendant Friedrichs.  ECF No. 22-1 at 22.  In opposition,

20    plaintiff argues that defendant Parker-Wright "misled the officers to subdue [him] instead of offer

21    [him] medical assistance," and acted with bias when she initiated a 415-deputy involved response

22    after he had already surrendered.  ECF No. 23 at 3, 4; see also ECF No. 37 at 14, 20.

23         Defendants' first argument is wrong on the law.  Conduct that does not involve physical

24    contact between defendant and plaintiff can give rise to an actionable claim for excessive force.

25    A supervisor can be liable for excessive force for his "personal involvement" in ordering use of

26    force and/or their inaction during the use of force, Rodriguez v. County of Los Angeles, 891 F.3d

27    776, 798 (9th Cir. 2018), or when the conduct (use of force lacking physical contact) is

28    objectively unreasonable.  Robinson v. Solano County, 278 F.3d 1007 (9th Cir. 2002) (en banc)

1  (pointing a gun at an unarmed suspect could give rise to an excessive force claim).  Here,

2  however, although plaintiff asserts defendant Parker-Wright instructed deputies to use force, he

3  provides no evidence that she was their supervisor or that she directed them to use force.  Instead,

4  the evidence shows defendant Parker-Wright contacted deputies to respond to a situation where

5  plaintiff refused to lock down and Murphy, Mora, and defendant Friedrichs responded as they

6  saw fit.  When plaintiff failed to comply with nondefendant Murphy's instruction to lock down in

7  his cell, and walked away from his cell, they decided to handcuff him.  Because plaintiff made a

8  sudden movement towards defendant Friedrichs while they were handcuffing him, they decided

9  to transitorily pin plaintiff's chest on the table and lower him to the ground.  There is no evidence

10  they were acting under orders from defendant Parker-Wright or anyone else.

11       Plaintiff also fails to provide evidence that defendant Parker-Wright's decision to contact

12  Murphy, Mora, and defendant Friedrichs to respond to the situation and/or make a 415-deputy

13  involved call after a struggle ensued between plaintiff and the deputies was objectively

14  unreasonable.  Defendant Parker-Wright tried to temper or limit the amount of force by

15  instructing plaintiff to lock down.  After he failed to comply for about five minutes, she contacted

16  deputies to respond.  When the situation rapidly evolved to a physical struggle between plaintiff,

17  Murphy, Mora, and defendant Friedrichs, where plaintiff was resisting, it was objectively

18  reasonable to make a 415-deputy involved call to address the increase to the severity of the

19  problem and threat.  These factors, along with the lack of injury, show defendant Parker-Wright's

20  actions were not objectively unreasonable.

21       Plaintiff attempts to use defendant Parker-Wright's statement that she was made aware of

22  the fact that plaintiff was a "problematic inmate" as evidence of her bias and/or "malicious

23  intent."  ECF No. 37 at 15.  Subjective intent, however, is not relevant to the objective

24  reasonableness analysis.  Graham, 490 U.S. at 397 ("the question is whether the officers' actions

25  are 'objectively reasonable' in light of the facts and circumstances confronting them, without

26  regard to their underlying intent or motivation.") (citations omitted).  Instead, to prove his claim,

27  plaintiff must put forth evidence that the circumstances were different than those currently

28  established by the evidence, and that under those circumstances a reasonable officer would not

1  have called deputies to respond to plaintiff's failure to lock down or made a 415-deputy involved

2  call after a struggle ensued.  Plaintiff has not met this burden.

3                     3.  Excessive Force Claim Against Defendant Friedrichs

4                              a.  Undisputed Facts

5          On December 2, 2021, defendant Parker-Wright contacted Five East control room for

6  additional support in responding to plaintiff's failure to lock down.  DSUF ¶ 4.  Mora and

7  defendant Friedrichs responded.  Id.  Murphy instructed plaintiff to go in his cell and close the

8  door.  DSUF ¶ 6; ECF No. 37 at 3 (Pl's Decl. ¶¶ 11-12), 20 (Response to DSUF ¶ 6).  Plaintiff,

9  who appeared agitated, did not comply.  Id.  Instead, he walked towards the deputies, pointed and

10  motioned his hands towards them, turned around before reaching them, walked back towards his

11  cell, passed his cell, walked to a table, dropped to his knees and put his hands in the air.  DSUF

12  ¶¶ 6-7; ECF No. 22-8 (6E Indoor Rec at 06:24-6:41).  When the deputies approached, Murphy

13  placed plaintiff's right hand behind his back, while defendant Friedrichs placed plaintiff's left

14  hand behind his back.  DSUF ¶ 7; ECF No. 37 at 3 (Pl's Decl. ¶ 12); ECF No. 22-8 (6E 100

15  Towards Entry 06:46-06:50).  At this time, plaintiff had a piece of paper in his left hand and faced

16  forward.  ECF 22-8 (6E 100 Towards Entry 06:46-06:50).  Plaintiff turned his head to the right to

17  talk to Murphy, but did not move his body.  Id.  (6E 100 Towards Entry 06:51-06:52).  When

18  defendant Friedrichs took the piece of paper out of plaintiff's hand and threw it on the table,

19  plaintiff suddenly turned his head towards defendant Friedrichs and shifted his left knee

20  backwards.  Id. (6E 100 Towards Entry 06:52-06:53); DSUF ¶ 7.  Murphy and defendant

21  Friedrichs briefly pinned plaintiff's chest against the table in front of him.  DSUF ¶ 8; ECF No.

22  22-8 (6E 100 Towards Entry 06:54-06:55).  A struggle ensued.  DSUF ¶¶ 7-8; ECF No. 22-8 (6E

23  Indoor Rec at 06:55-06:57), (6E 100 Towards Entry at 06:55-06:57).  Murphy and defendant

24  Friedrichs pushed plaintiff towards the ground while trying to maintain control of his arms.  Id.

25  Mora tried to secure plaintiff's legs.  Id.

26          Plaintiff was told no less than three times to stop resisting and give up his hands.  DSUF

27  ¶ 8.  Plaintiff broke his hands free, and walked them towards the table, away from Murphy and

28  defendant Friedrichs.  Id.; ECF No. 22-8 (6E Indoor Rec at 06:57-07:00).  Murphy and defendant

1    Friedrichs tried to turn plaintiff on his stomach, but he was uncooperative.  DSUF ¶ 8; ECF No.

2    22-8 (6E Indoor Rec at 07:00-07:10).  As plaintiff continued to resist, defendant Friedrichs

3    kneeled on the ground and tried to regain control of plaintiff's left arm, and Murphy, wrapped his

4    arms around plaintiff's torso to regain control of plaintiff's right arm.  Id.  Defendant Friedrichs

5    pulled plaintiff's left arm from underneath him, causing plaintiff to fall onto his chest.  DSUF ¶ 8;

6    ECF No. 22-8 (6E Indoor Rec at 07:11-07:12).  Defendant Friedrichs laid on the ground next to

7    plaintiff while restraining plaintiff's left arm.  ECF No. 22-8 (6E Indoor Rec at 07:11-07:33).

8         Once handcuffed, Murphy and defendant Friedrichs lifted plaintiff to his feet and began to

9    escort him out of the dayroom.  DSUF ¶ 9; ECF No. 22-8 (6E Indoor Rec at 08:24-08:25).

10    Plaintiff resisted moving forward by pulling back and twisting his body side to side.  DSUF ¶ 9;

11    ECF No. 22-8 (6E Indoor Rec at 08:25-08:36).  Defendant Friedrichs placed his left arm in

12    between plaintiff's right arm and torso and cupped plaintiff's right shoulder with his left hand.

13    DSUF ¶ 9; ECF No. 22-8 (6E Indoor Rec at 08:32).  As they approach the door to exit, plaintiff

14    resisted; nondefendant Murphy pushed plaintiff back in the direction of the door as defendant

15    Friedrichs pulled him in the same direction.  ECF No. 22-8 (6E 100 Towards Entry at 08:34-

16    08:35), (6E Towards Control at 02:40-2:42).  With the assistance of two other deputies, plaintiff

17    was pinned against the wall to the left of the door.  Id. (6E 100 Towards Entry at 08:35-08:36).

18    Seubert replaced Murphy, whose arm was pinned between the wall and plaintiff's body, and

19    plaintiff was escorted to the classroom.  DSUF ¶¶ 9, 11; ECF No. 22-8 (6E 100 Towards Entry at

20    08:45-08:59), (6E Towards 300 Pod at 03:14-03:33).

21         Plaintiff's neck and throat were not injured in the dayroom.  DSUF ¶ 10; ECF No. 22-7 at

22    31-33, 47 (Pl's Depo. 68:6-70:15, 84:5-15).  Approximately thirty-two second after plaintiff was

23    escorted into the classroom, defendant Friedrichs' physical contact with plaintiff ended.  ECF No.

24    22-8 (6E Visit at 04:30-32:30), (Handheld 00:00-10:29).

25                              b.   Analysis - Objective Reasonableness of Force Used

26         Defendants argue that plaintiff's claim against defendant Friedrichs fails because

27    defendant Friedrichs' use of force was objectively reasonable, and the injury alleged was not

28    caused by defendant Friedrichs.  ECF No. 22-1 at 23.  Plaintiff responds that evidence shows he

                                        29

did not resist.  ECF No. 23 at 5; see also ECF No. 37 at 15-16.  Specifically, plaintiff claims the

following: after plaintiff surrendered, Murphy and defendant Friedrichs approached him from

behind and "instantly pulled [him] off the stool to [his] knees violently.  [He] still stayed calm

and co-operative [sic] with [his] hands in the air," ECF No. 37 at 3 (Pl's Decl. ¶ 13); defendant

Friedrichs "violently snatched [his] legal document out [his] hands and shoved [him]," id. (Pl's

Decl. ¶ 14); plaintiff "turned" and "advised [defendant Friedrichs] that it was his legal paperwork

for [his] case," and "stayed kneeled down with [his] hands up until Friedrichs slammed [him]

violently on the ground, pulling [him] away from deputy Murphy who was handcuffing [his] right

hand," id. at 4 (Pl's Decl. ¶ 15), 31 (PSUF ¶ 5); Murphy, Mora, and defendant Friedrichs "all

applied their body weight upon plaintiff, riding plaintiff like an animal even while submitted to

handcuffs," id. at 31 (PSUF ¶ 5); while plaintiff was being escorted, plaintiff did not pull away

and did not have unpredictable behavior that required changing holds, ECF No. 23 at 6 (Initial

Response to DSUF ¶ 9); and when plaintiff was pinned against the wall, "up to 20 deputies

exert[ed] full control on [his] body."  ECF No. 37 at 4 (Pl's Decl. ¶ 19).

   Video evidence irrefutably contradicts plaintiff's version of events.  Although plaintiff

surrendered and was on his knees, and his hands were behind his back when the struggle ensued,

video evidence shows that plaintiff suddenly turned his head towards defendant Friedrichs and

shifted his weight.  In response, Murphy and defendant Friedrichs briefly pinned plaintiff against

the table.  Defendant Friedrichs did not tackle or ride plaintiff, or slam (forcefully push) plaintiff

into the ground.  When plaintiff continued to resist their efforts to secure his hands, defendant

Friedrichs pulled plaintiff's arm from under him, causing plaintiff's upper body to hit the ground.

When defendant Friedrichs did this, plaintiff was not standing or kneeling; plaintiff's lower body

was already on the ground and plaintiff's upper body was already leaning towards the ground.

ECF No. 22-8 (6E Indoor Rec at 07:11-07:12).  As defendant Friedrichs tried to regain control of

plaintiff's left arm, he did not apply his body weight upon plaintiff; he kneeled, leaned, or laid on

the ground *next to* plaintiff.  Id. (6E Indoor Rec at 06:57-07:33).

   Applying the objectively reasonable factors to the undisputed facts, the undersigned finds

that a reasonable jury could not conclude that defendant Friedrichs' use of force at this point was

objectively unreasonable.  Considering plaintiff was agitated, had walked towards the deputies pointing and waving his arms at them, refused to lock down when ordered to do so in the thirty seconds leading up to this point, and had refused to lock down in the five minutes before the deputies arrived, it was not objectively unreasonable for defendant Friedrichs to briefly pin plaintiff's chest to the table in front of him and take him to the floor to prevent plaintiff from harming him, Murphy, and/or Mora.  Plaintiff was repeatedly told to stop resisting but he did not. Although plaintiff's resistance was not substantial, neither was the amount of force used. Plaintiff's complaint alleged he was kneed in the neck or throat, but he testified that no one touched his neck or throat while he was in Six East 100 Pod, and as noted before, he fails to put forth evidence of an injury.  Even though lack of injury is not outcome determinative, here it confirms what the other factors already show—that the amount of force used was reasonable under the circumstances.

Similarly, while plaintiff claims he was not resisting as he was being escorted out of Six East 100 Pod, the video evidence contradicts this and further contradicts his testimony that twenty officers pinned him against the wall.  Given plaintiff's resistance at this point, it was not objectively unreasonable for defendant Friedrichs and three other deputies to transitorily pin plaintiff against the wall to regain control and complete the escort.  Moreover, plaintiff has not put forth evidence that any of the force used *by* defendant Friedrichs at this point caused injury or was excessive.  Instead, he complains about the amount of force used by Murphy and Seubert, who are not defendants in this case, and are therefore irrelevant to this discussion.[15]

#### 4.  Excessive Force Claim Against Defendant Solovyev

##### a.  Undisputed Facts

On December 2, 2021, defendant Solovyev, a deputy, working in male booking responded to a 415-deputy involved fight initiated by defendant Parker-Wright.  DSUF ¶ 12.  As a WRAP

---

[15]  Plaintiff also argues that defendant Friedrichs retaliated against him by failing to provide plaintiff with written notice for the referral for criminal prosecution, engaged in "malicious prosecution," and violated 18 U.S.C. §§ 241, 242, and 1512(b)(3).  ECF No. 23 at 5-6; ECF No. 37 at 16.  The complaint, however, did not allege any of these claims against defendant Friedrichs.  These claims, therefore, are irrelevant in this case and warrant no further discussion.

1    cart instructor, he brought with him a WRAP restraint cart.  Id.

2          Defendant Solovyev did not witness the incident in the dayroom.  Id.  When defendant

3    Solovyev arrived, plaintiff was already seated in the classroom and had not been kneed, hit, beat,

4    or struck by anyone.  Id.; ECF No. 22-8 (6E Visit at 04:28-06:33); ECF No. 22-7 at 30-33, 47

5    (Pl's Depo. 68:6-70:15, 84:5-15).  Defendant Solovyev's interaction with plaintiff started

6    eighteen minutes later.  ECF No. 22-8 (6E Visit at 06:33-24:21).

7          While plaintiff was seated and handcuffed, defendant Solovyev informed plaintiff that he

8    was going to be moved to the eighth floor because of the incident in the dayroom.  DSUF ¶ 14;

9    ECF No. 22-8 (Handheld at 00:00-00:12).  Plaintiff asked if he could get his legal paperwork.

10   DSUF ¶ 14; ECF No. 22-8 (Handheld at 00:00-00:12).  Defendant Solovyev informed him that it

11   would be collected for him and transferred to the eighth floor and instructed plaintiff to stand up

12   and walk.  DSUF ¶ 14; ECF No. 22-8 (Handheld at 00:12-01:21).  Plaintiff did not comply.  ECF

13   No. 22-8 (Handheld 01:19-01:22).  Nondefendants Amaya, who was situated to plaintiff's left,

14   and Tibb, who was situated to plaintiff's right, helped plaintiff stand up and pulled up his pants,

15   which had fallen during the initial struggle to handcuff him and again as he was being escorted to

16   the classroom.  Id. (Handheld at 01:10-01:25), (6E Indoor Rec at 07:00-07:21, 8:32-08:35), (6E

17   Towards Control at 02:41, 3:15-03:33).  Defendant Solovyev explained that plaintiff had already

18   been given a chance.  DSUF ¶ 14; ECF No. 22-8 (Handheld at 01:25-01:29).  Plaintiff dropped to

19   his knees, begged defendant Solovyev, and refused to stand up when defendant Solovyev directed

20   him to do so.  ECF No. 22-8 (Handheld at 01:25-01:29).

21         Because plaintiff refused to comply with defendant Solovyev's instructions to stand up

22   and walk to his new housing unit, defendant Solovyev requested the WRAP cart and Amaya and

23   Tibbs lowered plaintiff to the ground.  Id.  (Handheld at 00:00-01:45).  Two deputies strapped

24   plaintiff's ankles together.  Id.  Plaintiff moved his head from side to side without any issue.  Id.

25   Plaintiff was lifted and placed in the WRAP cart.  Id. (Handheld 02:16-02:34).  As plaintiff was

26   wheeled to exit the classroom, plaintiff tried to eject himself off the cart.  DSUF ¶ 15; ECF No.

27   22-8 (Handheld 02:40-02:43).  Defendant Solovyev and two other deputies held him down on the

28   cart.  DSUF ¶ 15; ECF No. 22-8 (Handheld 02:40-02:43).  DSUF ¶ 15; ECF No. 22-8 (Handheld

at 02:43-02:58).  Plaintiff turned towards Solovyev, opened his mouth, made a biting gesture towards him, and said "I'm about to bite you."  DSUF ¶ 15; ECF No. 22-8 (Handheld at 02:50-02:52).  Two deputies placed their hands on the top and side of plaintiff's face and turned plaintiff's face away from defendant Solovyev and held it for about seven seconds before letting go.  ECF No. 22-8 (Handheld at 02:52-02:57).  Amaya and defendant Solovyev decided to use the full WRAP restraint.  Id. (Handheld at 02:48-02:55).  The officers lifted plaintiff out of the cart, placed him on the ground, and turned him on his stomach.  Id. (Handheld 03:04-03:06).  While on his stomach, plaintiff freely lifted his head and talked directly to the camera.  Id.  The chest restraint was added, and plaintiff was moved to a sitting position.  Id. (Handheld at 04:10-05:10).

Plaintiff was lifted into the WRAP cart, handcuffed to the cart, and a helmet was secured on his head.  Id. (Handheld at 05:12-05:52).  A nurse checked plaintiff's restraints.  Id. (Handheld at 06:19-07:32).  Plaintiff told the nurse he did not need to check the leg restraint because it was "all good" and it was "very comfortable."  Id. (Handheld 06:22-06:44).  The nurse responded, "I have to worry about it" and continued to examine plaintiff.  Id. (Handheld 06:50-07:32).  Plaintiff did not express any concerns regarding his mental health or any injury to the nurse.  Id. (06:19-07:32).

While plaintiff was secured in the classroom and escorted to the safety cell, plaintiff continued to make statements that indicated he might be a danger to himself or others.  He told a female deputy that she should call a man to do her job because "this is dangerous," "see I can still push," and he pressed his feet against her leg.  Id. (Handheld 04:45-05:02).  He told defendant Solovyev, "Listen, listen.  I'm about to kill your daughter.  Slap me for it.  Hey, listen.  Listen. I'm about to bite you.  Hey, hey, hey Solovyev, I'm about to bite you.  Slap me for it."  Id. (Handheld at 07:30-07:40).  Plaintiff also told Solovyev to hit him, torture him, make it gory, make sure he "suffered tremendously," to send him underground because "I'm about to bite you," and that he (plaintiff) could kill Solovyev and get away with it because of his mental health issues.  Id. (Handheld at 08:09-09:04).  During the entire time plaintiff was in the classroom and escorted to the safety cell, no defendant or deputy placed their knee(s) on or around plaintiff's neck, throat, or upper body, or otherwise hit or beat him.  Id. (6E Visit at 04:27-32:09),

1    (Handheld, 00:00-10:29).

2                              b.   Analysis – Objective Reasonableness of Force Used

3            Defendants argue that plaintiff's excessive use of force claim against defendant Solovyev

4    fails because it was objectively reasonable for Solovyev to transport plaintiff in the WRAP cart

5    after plaintiff failed to stand and walk and to fully restrain plaintiff using a WRAP restraint after

6    plaintiff attempted to eject himself from the cart and to bite Solovyev.  ECF No. 22-1 at 23.

7    Plaintiff does not dispute that he dropped to his knees but explains that it was not him acting out,

8    it was him trying to beg defendant Solovyev to let him get his legal paperwork, and that he did

9    not try to bite anyone or make a forward motion with an intent to bite anyone.  ECF No. 23 at 9;

10   ECF No. 37 at 6-7 (Pl's Decl. ¶ 35), 24-25 (Response to DSUF ¶¶ 14-16).

11           Applying the objectively reasonable factors to the facts and viewing the evidence in the

12   light most favorable to plaintiff, the undersigned is unable to find that a reasonable jury could

13   conclude that defendant Solovyev's use of force was objectively unreasonable.  Cf. Tatum v. City

14   of Cnty. of San Francisco, 441 F.3d 1090 (9th Cir. 2006) (holding that an officer's use of a

15   restrictive hold was objectively reasonable because, although the defendant was being arrested for

16   non-severe conduct, the defendant was resisting arrest and "posed a threat to himself, to the

17   police, and possibly to anyone who passed by him" as he spun away and continued to struggle);

18   Rocha v. City of Antioch, No. 19-cv-7312 MMC, 2021 WL 916910, at *3, 2021 U.S. Dist.

19   LEXIS 46091, at *8-9 (N.D. Cal. Mar. 10, 2021) (finding no excessive force claim based on use

20   of WRAP restraint where undisputed evidence showed plaintiff was not compliant and was a

21   danger to himself and others); Huerta v. City of Santa Barbara, No. 17-cv-6225 TJH (JEMx),

22   2019 WL 4860923, at *1, 2019 U.S. Dist. LEXIS 171521, at *7-8 (C.D. Cal. Oct. 1, 2019)

23   (finding no excessive force claim based on use of WRAP restraint where undisputed evidence

24   showed plaintiff refused to comply with requests to voluntarily leave and resisted arrest, and had

25   to be carried down a flight of stairs); Garcia v. City of Santa Clara, No. C 10-2424 SI (pr), 2015

26   WL 5299460, at *11, 2015 U.S. Dist. LEXIS 120086, at *36 (N.D. Cal. Sept. 9, 2015) (finding

27   use of wrap restraint to carry plaintiff to the police car was "not severe" where plaintiff continued

28   to struggle despite being handcuffed).

By the time plaintiff was interacting with defendant Solovyev, plaintiff had refused to comply with orders to lockdown in his cell, refused to comply and resisted efforts to handcuff him, and resisted efforts to escort him out of Six East 100 Pod. Despite plaintiff's statements that he would comply with orders given to him, he refused to stand and walk when defendant Solovyev ordered him to do so. Because plaintiff was being uncooperative, but did not appear to be a danger to himself or others, deputies lowered him to the ground, added an ankle restraint, and lifted him into the WRAP cart to be transported. Defendant Friedrichs did not add the leg and chest restraints. Only after plaintiff tried to eject himself out of the moving cart and to bite defendant Solovyev, did Amaya and defendant Solovyev decide full WRAP restraints were necessary to protect plaintiff from himself and protect others from him. The leg and chest restraints were added, plaintiff's handcuffs were secured to the WRAP cart, a helmet was secured to plaintiff's head, and plaintiff was cleared by a nurse before transport. At no point during this time was plaintiff kneed, struck, or hit in the neck, throat, or upper body, or otherwise beaten. Moreover, plaintiff puts forth no evidence of any injury. Although lack of injury is not outcome determinative, this factor combined with all the other factors, further supports the court's finding that the amount of force used was reasonable under the circumstances.

### 5. Conclusion Regarding Plaintiff's Excessive Force Claims

The evidence, even when viewed in the light most favorable to plaintiff, does not support a reasonable jury conclusion that the force used by defendants Parker-Wright, Friedrichs and/or Solovyev was objectively unreasonable. The undersigned accordingly recommends that defendants' motion be granted on these claims. Considering this recommendation, the court declines to reach defendants' assertion of qualified immunity and their challenges to various forms of relief sought by plaintiff.

### iii. Fourteenth Amendment Equal Protection Clause Claim

### 1. Legal Standard

The Fourteenth Amendment's Equal Protection Clause requires the State to treat all similarly situated people equally, City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, (1985) (citation omitted), and "[p]risoners are protected under the Equal Protection Clause of the

1  Fourteenth Amendment from invidious discrimination based on race." <u>Wolff v. McDonnell</u>, 418

2  U.S. 539, 556 (1974) (citation omitted).  "Proof of racially discriminatory intent or purpose is

3  required to show a violation of the Equal Protection Clause." <u>Vill. of Arlington Heights v. Metro.</u>

4  <u>Hous. Dev. Corp.</u>, 429 U.S. 252, 265 (1977).  To survive a motion for summary judgment, "a

5  plaintiff must only produce evidence sufficient to establish a genuine issue of fact as to the

6  defendant's motivations." <u>FDIC v. Henderson</u>, 940 F.2d 465, 471 (9th Cir. 1991) (footnote

7  omitted).

8                                  2.  <u>Undisputed Facts</u>

9        Defendant Solovyev's last name is of Russian origin.  ECF No. 22-5 at 1 (Solovyev Decl.

10  ¶ 12).  During defendant Solovyev's interaction with plaintiff on December 2, 2021, defendant

11  Solovyev did not comment on plaintiff's race or ethnicity.  DSUF ¶ 16; ECF No. 22-5 at 1

12  (Solovyev Decl. ¶ 14); ECF No. 22-8 (Handheld at 00:00-10:18).

13        Plaintiff, however, made several comments to the deputies, including defendant Solovyev.

14  DSUF ¶ 16; ECF No. 22-8 (Handheld at 00:00-10:29).  When deputies were securing plaintiff to

15  the WRAP cart, plaintiff stated, "you think because I'm black; I'm African American you think,

16  bro.  All you racist mother fuckers, you all going to suffer for this.  I guarantee you.  I'm going to

17  have you in court."  <u>Id.</u> (Handheld at 05:07-05:26).  Once secured, plaintiff stated, "this is how

18  I'm being treated for my mental health.  For my mental health.  No violence, just for my mental

19  health."  <u>Id.</u> (Handheld at 05:54-06:00).  Defendant Solovyev responded, "no, you tried to bite a

20  deputy."  <u>Id.</u> (Handheld at 06:00-06:01).  Plaintiff responded by insulting defendant Solovyev,

21  calling him "a foolish, dumb, white prick racist [inaudible]" and saying "you are a bastard.  A

22  bastard.  You're nothing."  <u>Id.</u> (Handheld 06:10-06:42).  Plaintiff repeatedly called defendant

23  Solovyev a "dumb fool" and a "bastard," <u>id.</u> (Handheld at 07:05-07:26) and said "you're not

24  going to get promoted for life Solovyev.  Whatever, I just know the spelling of your Russian

25  stupid bastard name.  You're a bastard.  Send me to underground nigger," <u>id.</u> (Handheld at 8:46-

26  08:55), and "you're not educated, you just got a GED.  Dumbass mother fucker.  You're dumb,

27  uneducated.  What is hurting you right now is an uneducated disease.  Racism."  <u>Id.</u> (Handheld at

28  9:11-9:20).

1    At plaintiff's deposition, plaintiff testified that defendant Solovyev "didn't say nothing

2    about black or N-word," never called plaintiff a "Jew" or said a bad word related to plaintiff

3    being "Jewish," and did not make "anti-Semitic remarks."  DSUF ¶ 17; ECF No. 22-7 at 39-42

4    (Pl's Depo. 76:10-79:14).

5                    3.  <u>Analysis – No Equal Protection Clause Violation</u>

6    Defendants argue that plaintiff cannot establish defendant Solovyev discriminated against

7    him based on race[16] because there is no evidence that plaintiff was "racially disparaged or

8    verbally accosted by Deputy Solovyev."  ECF No. 22-1 at 25-26 (Def's MSJ Brief).  In

9    opposition, plaintiff argues that "defendants" violated the Equal Protection Clause by

10   permanently depriving him of his property (legal documents), without any due process.  ECF No.

11   37 at 16.  In response to DSUF paragraph seventeen, which quotes plaintiff's deposition

12   testimony the lack of discriminatory statements made by defendant Solovyev, plaintiff states he

13   was under the influence of a category IV narcotic the day of his deposition, which he did not

14   disclose out of "uncertainty of being judged by the defendants and fear for failing any court

15   expectations surround controlled substances."  ECF No. 37 at 25 (Response to DSUF ¶ 17).

16    As an initial matter, the response in plaintiff's supplemental brief regarding this claim is

17   unresponsive, or as defendants' frame it, nonsensical.  Arguments concerning a deprivation of

18   life, liberty, and property without due process are not arguments in support of an Equal Protection

19   Clause claim; they are arguments regarding a Fourteenth Amendment due process claim, which

20   was not alleged in the complaint and is not at issue in this case.  <u>See</u> <u>Tellis v. Godinez</u>, 5 F.3d

21   1314, 1316 (9th Cir. 1993) (to warrant protection under the Fourteenth Amendment Due Process

22   Clause, a plaintiff must establish that their life, liberty, or property interest is at stake); ECF No.

23   1; ECF No. 7.  Accordingly, those arguments are disregarded.

24    Plaintiff's attempt to undermine his deposition testimony also fails.  Plaintiff does not

25   _____

26   [16]  Defendants also argue plaintiff cannot establish defendant Solovyev discriminated against him based on religion.  ECF No. 22-1 at 26.  However, plaintiff's religious claims were dismissed, and

27   therefore are no longer at issue.  <u>See</u> ECF No. 11; ECF No. 22-7 at 40 (Pl's Depo. 77:13-21) (with respect to his religious claims, plaintiff testified that he was not pursuing those claims

28   because defendant Solovyev might not have said something about plaintiff's religion)

1    provide proof that he was under the influence of a narcotic on the day of his deposition, April 19,

2    2024, nor does he state how the medication impacted his ability to be truthful or otherwise

3    impaired his testimony.  See ECF No. 22-6 at 27 (Pl's Depo. Cover Page).  To the extent plaintiff

4    offers Exhibit L for this purpose, even if the court had not excluded this document, Exhibit L does

5    not show what plaintiff implies it shows because the records show the medication was started

6    several months after plaintiff's deposition.  See ECF No. 37 at 77.  Moreover, plaintiff's response

7    does not *identify* evidence to support his claim, which supports defendants' argument that

8    plaintiff cannot prove his claim.

9        Because there is no evidence to permit a reasonable trier of fact to find by a

10   preponderance of the evidence that defendant Solovyev's decisions were racially motivated, the

11   undersigned recommends defendants' motion for summary judgment on this claim be granted.

12                    iv.   First Amendment – Retaliation

13                        1.   Legal Standard

14       "Within the prison context, a viable claim of First Amendment retaliation entails five

15   basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2)

16   because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

17   exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

18   correctional goal.  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005) (citations omitted).

19                        2.   Undisputed Facts

20       On December 2, 2021, while plaintiff was in the classroom and transported to the safety

21   cell, plaintiff indicated he was going to sue defendant Solovyev and other deputies for their

22   conduct.  ECF No. 22-8 (Handheld at 02:59-03:47, 04:10-04:38, 05:01-06:30, 07:07-10:03).  On

23   December 3, 2021, defendant Friedrich submitted his report about the incident that occurred on

24   December 2, 2021, in the dayroom, not the classroom or safety cell.  ECF No. 22-4 at 90 (Report

25   2021-368714, DEF 00087).  The report lists defendant Friedrichs and Murphy as victims; and

26   plaintiff as the suspect.  ECF No. 22-4 at 90-91, 93-96 (Report 2021-368714, DEF 00087-88,

27   00090-92).  Defendant Solovyev is not listed as a victim, did not author or write a narrative for

28   the report.  ECF No. 22-4 at 90-106 (Report 2021-368714, DEF 00087-103).

1    O'Connor approved the report on December 5, 2021.  DSUF ¶ 20; ECF No. 22-4 at 90

2    (Report 2021-368714, DEF 00087).  O'Connor was responsible for forwarding the crime report

3    onto the watch commander for approval.  DSUF ¶ 20; ECF No. 22-5 at 2 (Solovyev Decl. ¶ 18).

4    Once the crime report is approved by the watch commander it is entered into Sacramento

5    Sheriff's Department reporting system.  Id.  The report is then sent to Records Transcription

6    which is then forwarded to the district attorney's office for submission.  Id.  Deputy Solovyev

7    was not the watch commander responsible for approving the report, did not forward the crime

8    report to the district attorney's office, and did not contact the district attorney's office regarding

9    the incident between plaintiff and defendant Friedrichs.  Id.

10                        3.    Analysis – No Retaliation in Violation of the First Amendment

11    Defendants argue that plaintiff's retaliation claim fails because "[n]o evidence exists that

12    Deputy Solovyev contacted the Sacramento district attorney's office because Plaintiff threatened

13    to file a civil lawsuit."  ECF No. 22-1 at 26.  In opposition, plaintiff argues that the district

14    attorney referral process created liberty interests under the Fourteenth Amendment, which

15    required due process to ensure his "state created rights were not arbitrarily abrogated."  ECF No.

16    37 at 15; see also ECF No. 23-1 (Pl's MSJ Reply) (no response to defendants' motion for

17    summary judgment on plaintiff's retaliation claim).

18    As an initial matter, plaintiff's opposition does not respond to any issue related to his

19    retaliation claim against defendant Solovyev and fails to counter any of defendants' evidence.

20    Plaintiff's Exhibit I merely confirms that plaintiff was arrested for an incident on or around

21    December 6, 2021, and that the United States Probation Office of the Central District of

22    California was investigating, but nothing else.  See ECF No. 37 at 68.  Also, the record is devoid

23    of evidence supporting the first element of plaintiff's retaliation claim: an adverse action *by*

24    defendant Soloyvev.  Accordingly, the undersigned recommends granting defendants' motion on

25    this claim.

26    V.    Plain Language Summary of this Order for a Pro Se Litigant

27    The undisputed evidence, which includes video evidence and your testimony, shows that

28    defendants Parker-Wright and Solovyev were not deliberately indifferent to your medical needs,

39

and defendants Parker-Wright, Friedrichs, and Solovyev did not use excessive force against you.
There is no evidence that defendant Solovyev discriminated against you based on your race or
ethnicity, or retaliated against you in violation of the United States Constitution. Accordingly, the
magistrate judge is recommending that defendants' motion for summary judgment be granted.

CONCLUSION

IT IS HEREBY ORDERED that:

1. Defendants' motion to strike (ECF No. 41) is GRANTED in part and DENIED in part
as follows: granted with respect to Exhibits J and L, and denied with respect to Exhibits F, I, K,
and Q.

2. The Clerk of the Court is directed to update the docket to reflect the correct spelling
for defendant Friedrichs' last name, and to randomly assign a United States District Judge to this
action.

IT IS HEREBY RECOMMENDED that defendant's motion for summary judgment (ECF
No. 22) be granted, and judgment entered in favor of defendants.

These findings and recommendations are submitted to the United States District Judge
assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days
after being served with these findings and recommendations, any party may file written
objections with the court and serve a copy on all parties. Such a document should be captioned
"Objections to Magistrate Judge's Findings and Recommendations." Any response to the
objections shall be served and filed within fourteen days after service of the objections. The
parties are advised that failure to file objections within the specified time may waive the right to
appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 22, 2025

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE